___ FILED   ___ ENTERED
____ LOGGED _____ RECEIVED

3:47 pm, Oct 14 2022

AT  BALTIMORE
CLERK, U.S. DISTRICT COURT
DISTRICT OF MARYLAND
BY _____Deputy

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF MARYLAND**

| | |
|---|---|
| IN THE MATTER OF THE SEARCH OF THE SUBJECT ELECTRONIC DEVICE DESCRIBED IN ATTACHMENT A | Case No. ___22-mj-02820-BAH____ |

**AFFIDAVIT IN SUPPORT OF SEARCH WARRANT**

Your Affiant, Task Force Officer Michael Collins, being duly sworn, deposes and states as follows:

**INTRODUCTION**

1.     I submit this affidavit in support of an application for a search warrant authorizing the search of the following cellular telephone and any associated memory cards attached to the telephone:

a. **One black iPhone: IMEI number 356443105088928, seized from Dewayne SEARCY Jr.**

2.     The above-described devices are also described in Attachment A*,* and referred herein as the "**Subject Electronic Device or SED**." The **Subject Electronic Device** is currently in the custody of the DEA's Baltimore District Office, Strike Force Group 3. The **Subject Electronic Device** remains in the same or substantially same condition as when they were first seized by law enforcement officers. The applied-for warrant would authorize the forensic examination of the **Subject Electronic Device** for the purpose of identifying electronically stored data particularly described in Attachment B.

3.     Based on the facts set forth in this affidavit, there is probable cause to believe that the **Subject Electronic Device** contains evidence of the crime of possession of a firearm by a prohibited person, in violation of 18 U.S.C. § 922(g), as well as distribution of, and conspiracy to, distribute controlled substances in violation of 21 U.S.C. §§ 841, 846.

1

4.      Because I submit this affidavit for the limited purpose of establishing probable cause for the issuance of a search warrant, I have not included each and every fact known to me concerning this investigation. I have not, however, omitted information that would defeat a determination of probable cause.

## AFFIANT EXPERTISE

5.      I am a Task Force Officer ("TFO") with the DEA, and an investigative or law enforcement officer of the United States, within the meaning of Section 2510(7) of Title 18, United States Code, and empowered by law to conduct investigations of and to make arrests for offenses enumerated in Section 2516 of Title 18, United States Code.

6.      Through my training and prior experience in drug trafficking investigations and arrests, I am familiar with the actions, traits, habits, and terminology utilized by drug traffickers. I am familiar with the ways in which narcotic traffickers conduct their business, including methods of importing and distributing narcotics, money laundering, the use of cellular telephones and the internet to facilitate their illegal acts, and the use of numerical codes and code words to conduct drug transactions.

7.      I am a Detective with the Baltimore City Police Department ("BPD") and have been with the BPD since February 1999. I have been deputized as a TFO with the DEA for approximately 15 years. I am currently assigned to DEA Strike Force 3 and previously assigned to DEA Group 51 (DEA Group 51 VTI), which investigates drug trafficking organizations in the Baltimore metropolitan area of Maryland. During my time as a law enforcement officer, I have received over 80 hours of specialized training in the field of controlled dangerous substances from the Baltimore City Police Academy and other agencies. I have a B.S. in Criminal Justice, and having attended the following classes, among others: Narcotic Identification Class, presented by

ODV, INC; Drug Field Testing; classes at St. Petersburg College, including Multijurisdictional Counter Drug Task Force Training, Pharmaceutical Drug Investigations, Undercover Operations, Legal Aspects Highway Drug Investigations, and Current Drug Trends; and classes at the DEA located in Quantico, Virginia, including Task Force Officer School and Money Laundering Seminar.

8.      I have also participated in numerous investigations involving drug trafficking, and as a result have become familiar with the following investigative tools and techniques: the use of confidential informants; undercover transactions; physical and electronic surveillance; telephone toll analysis; investigative interviews; the execution of search and seizure warrants; and the recovery of controlled substances, narcotics, narcotics proceeds, and narcotic paraphernalia.  I have reviewed audio conversations as well as documents and other records relating to narcotics trafficking.  I have testified as an expert in the field of narcotics in the United States District Court of Maryland and the Circuit Court of Baltimore City, Maryland.

9.      Based upon my training and experience, I have also learned that drug dealers frequently keep and maintain records of their various activities.  Experience in similar cases has established that such records are regularly concealed in a suspect's automobile, residence, office, and on his person, and that they take various forms.  Documents commonly concealed by traffickers, include but are not limited to notes in code, deposit slips, wired money transactions, savings pass books, hidden bank accounts, photographs of co-conspirators, various forms of commercial paper, personal address books, notebooks, records, receipts, ledgers, travel receipts (rental receipts, airline tickets, bus tickets, and/or train tickets) both commercial and private, money orders and other papers relating to the ordering, transportation, sale and distribution of controlled dangerous substances or other such documents which will contain identifying data on

the co-conspirators.  These items are kept in locations that are considered safe by the drug traffickers—such as safety deposit boxes, residences, vehicles, on their person, or stored in digital format on a personal electronic device—where they have ready access to them. I know that drug traffickers often have several residences, thereby decreasing the likelihood of detection by law enforcement.

10.     Through my training and prior experience in narcotics trafficking investigations and arrests, I am familiar with the actions, traits, habits, and terminology utilized by narcotics traffickers.  I am familiar with the ways in which drug traffickers conduct their business, including methods of importing and distributing narcotics, money laundering, the use of cellular telephones and the Internet to facilitate their illegal acts, and the use of numerical codes and code words to conduct narcotics transactions.  Based on this familiarization, I know the following:

11.     Drug trafficking is an ongoing and recurring criminal activity.  As contrasted with crimes against persons, which tend to be discrete offenses, drug trafficking is an illicit commercial activity that is characterized by regular, repeated criminal activity.

12.     Drug traffickers commonly compartmentalize members of their organization into discrete "cells," with specific members, responsibilities, and/or geographical territories assigned to each cell.  In that regard, I know that members of one cell commonly are provided with information only about their specific cell's criminal activities, thus limiting the information about the overall organization, and ultimately frustrating law enforcement efforts to dismantle the entire organization.

13.     Cellular telephones are an indispensable tool of the drug trafficking trade. Drug traffickers use cellular telephones, push-to-talk telephones, Short Message Service ("SMS"), electronic-mail, and similar electronic means and/or devices, often under fictitious names or names

other than their own, in order to maintain contact with other conspirators.  In addition, drug traffickers will often change their cellphones following the arrest of a member of their drug trafficking organization (DTO), or at random times in order to frustrate law enforcement efforts;

14.     Drug traffickers often place nominal control and ownership of telephones in names other that their own to avoid detection of those telephones by government agencies.  Even though telephones are in the names of other people, drug traffickers retain actual ownership, control, and use of the telephone, exercising dominion and control over them.

15.     The fruits and instrumentalities of criminal activity are often concealed in digital form.  Furthermore, digital camera technology is often used to capture images of tools and instrumentalities of pending criminal activity.  Cell phones have both digital storage capacity and digital camera capabilities.

16.     Individuals involved in drug trafficking often use digital storage devices to maintain telephone number "contact lists" of individuals who may have assisted in the planning of this and other criminal activity and sometimes take photographs of themselves and/or co-conspirators.

17.     Individuals who possess or own handguns or other weapons and/or illegal substances frequently photograph themselves holding the handguns or other weapons and/or illegal substances.

18.     Photographs on a suspect's digital device sometimes show the suspects handling proceeds from drug sales/trafficking or illegal substances.

19.     Individuals who engage in drug trafficking often use cellular telephones to communicate with co-conspirators via phone calls and text messages.

20.     Cell phones often record the phone's historical location data.

21.     Drug traffickers often swap vehicles with other conspirators, use vehicles with dealer/interchangeable registration plates, use rental vehicles, use multiple vehicles, and use vehicles registered in names other than their own in order to frustrate law enforcement efforts.

22.     Drug traffickers use uninhabitable locations (for example, vacant dwellings, storage lockers, garages, etc.), often under another person's name, as "stash locations" for the storage of drugs and currency, as well as to process and package drugs for distribution.  Your Affiant also know that houses and/or apartments within neighborhoods are often utilized as stash houses.

23.     Drug traffickers often maintain financial records and financial instruments related to their drug transactions and the profits derived from those transactions including, but not limited to, currency, bank checks, cashier's checks, Western Union receipts, money orders, stocks, bonds, jewelry, precious metals, and bank and real estate records. Such documents are frequently maintained where the traffickers have ready access to them, including in their residences. Drug traffickers frequently maintain books, records and other documents that identify and contain the names, addresses and/or telephone or pager numbers of associates in their drug-trafficking or money-laundering activities, including, but not limited to: address books, telephone books, rolodexes, and notes reflecting telephone and pager numbers, documents or other records relating to state court proceedings involving other co-conspirators, and audiotape recordings of conversations, including those made over telephone answering machines.

24.     Drug traffickers commonly use vehicles to move quantities of drugs and currency to other locations for storage and further distribution and use, and that drug traffickers often rent vehicles instead of using their own to prevent their own vehicles from being seized by law

enforcement officials.  Drug traffickers often have unexplained wealth, assets, and a high standard of living with no reported income which is probative evidence of crimes involving drug trafficking.

## PROBABLE CAUSE STATEMENT

25.     In March 2022, investigators from the Drug Enforcement Administration (DEA), Strike Force Group 3 (SFG3) began an investigation into the "No Excusez" Drug Trafficking Organization (DTO) operating in the Park Heights area of Baltimore City, Maryland.

26.     On August 23, 2022, at approximately 1:13 P.M., TFO Michael Collins by way of electronic surveillance equipment, observed a green Toyota sedan operated by a black male, later identified as Dewayne SEARCY Jr (YOB: 1993) enter into the 2800 block of Waldorf Avenue and meet with a DTO member at the driver's side door of a blue minivan parked in the block. SEARCY talked to the individual, who handed SEARCY two large heat-sealed plastic bags on two occasions in the block. Investigators have seized similar packages of heat-sealed marijuana from the DTO in the same block before. SEARCY went back to his vehicle both times and placed the bags into his vehicle before leaving the area.

27.     Investigators followed SEARCY in his green Toyota bearing Maryland registration 785Z61 until he was a safe distance away from the area of the DTO's operation.  Investigators conducted an investigatory stop in the 4000 block of North Rogers Avenue. Detectives identified themselves and ordered SEARCY out of the vehicle. SEARCY complied and TFO Avraham Tasher observed in plain view on the back seat of the car a large, heat-sealed bag of what appeared to be approximately one pound of marijuana, partially hidden under a shirt. SEARCY was placed under arrest by detectives. Pursuant to a search incident to arrest, a 9mm Smith & Wesson M&P Shield handgun was recovered from SEARCY's waistband area. The gun was loaded with eight rounds and ready to fire with a round in the chamber. Another pound (approximate) of suspected

marijuana was recovered from a pink backpack in the back-seat area of the vehicle, as well as a small baggie with a white rock-like material believed to be Schedule II fentanyl from the ash tray in the front of the car.  An EOTech Holographic Weapon Sight designed for use on an AR-15 style firearm was recovered from the trunk area. It should be noted that SEARCY had his daughter in the back of his car, asleep in a child's seat through the ordeal.

28.     Detective Ramsey read SEARCY his rights per Miranda.  SEARCY stated that he understood. SEARCY said that he is prohibited from possessing firearms due to prior convictions in the State of Georgia, which was later confirmed by the Maryland Gun Center (Harris County, GA: Battery – July 14, 2014 - case #8839534775103; and Obtain/Procure/Give Inmate Prohibited Item without Authorization – case #88390283343002). TFO Tasher observed SEARCY's Georgia driver's license and asked if one can just walk into a gun store in Georgia and buy a gun, to which SEARCY advised that he bought it "from a friend". TFO Tasher asked SEARCY if that was because he can't get it in a store, to which he advised that he couldn't because of a conviction for battery and smuggling a cell phone into jail. TFO Tasher asked SEARCY about the rifle sight that investigators recovered from his vehicle, and SEARCY stated that he intended to sell it to another friend. Based on TFO Tasher's training, knowledge, and experience, he believed that SEARCY had access to additional firearms despite his status as a prohibited person.

29.     Subject to a search incident to arrest, officers seized a black iPhone cellular telephone (**Subject Electronic Device)** from SEARCY. SEARCY requested that officers contact Devahjia SMITH, to respond to the scene to pick up SEARCY's child, who was asleep in the back of his Toyota. Using the **Subject Electronic Device**, officers contacted SMITH (phone number 667-280-0530) and advised her to respond to the intersection of Belle and Rogers Avenue. SMITH arrived a short time later in a black Jeep bearing Maryland registration 6ES7261 and retrieved the

baby, and took custody of $950 cash at the request of SEARCY that he had in his wallet at the time of arrest. Investigators overheard SEARCY tell SMITH that "they [meaning the police], got the *guns* (emphasis added)." Believing that there might be more guns in his vehicle, investigators conducted a secondary search with negative results.

30.     SEARCY was later transported to CBIF to be charged. While in transit, TFO Tasher had the opportunity to speak with SEARCY some more about his arrest. During this time, TFO Tasher asked him how much his source of supply charges for the marijuana, to which SEARCY replied "$500, six, I guess depending on who you are." Based on TFO Tasher's training, knowledge, and experience, he understood this to mean that he received a special discount, whereas some other buyers were required to pay $600. SEARCY was asked if he got the discount because he comes on a regular basis or was friends with his source.  SEARCY said that he only met the source within the past few months and has only visited approximately five times and that he does not even know the source's real name. SEARCY reiterated that he is not local, and that he just moved to the area from Georgia this year. SEARCY stated "I hit him up, and he lets me know when to come through." TFO Tasher believed this meant that SEARCY used his phone to contact the source. SEARCY was told that investigators would need to download the contents of the **Subject Electronic Device** and asked if he would give investigators the unlock code. SEARCY provided TFO Tasher with the unlock code "192389".

31.     In conclusion, Your Affiant knows that drug traffickers utilize cell phones to conduct business, and that it is likely that SEARCY and his source of supply in the 2800 block of Waldorf Avenue utilized some form of electronic communication via their respective cell phones to arrange for the sale and pickup of the drugs that officers recovered from SEARCY. Your Affiant also believes there is probable cause that contained within the phone will be additional messages

and data pointing to past and future drug activity, including sales that SEARCY has made, and/or other possible sources of supply, as well as sales that SEARCY intended to make after acquiring the suspected two pounds of marijuana. Additionally, Your Affiant believes that there could be information pointing to possible firearms violations, including the source of supply for SEARCY's firearm, because he is a prohibited felon unable to purchase lawfully from a federally licensed dealer.

32.     Based on Your Affiant's training and expertise, it is known that individuals who are involved in the sale of controlled dangerous substances often facilitate their dealings through the use of cellular phones. These phones are used for calls, texts, pictures, videos to further their distribution efforts. Additionally, these individuals will use web-based apps with end to end encryption messaging to avoid and thwart law enforcements effort to capture them. Based on Your Affiant's training and experience, Your Affiant knows that information of evidentiary value, including names, phone numbers, videos, pictures, and messages/communications are often found inside of the cellular phone and that information is normally stored for long periods of time.

33.     Based on the aforementioned, it is Your Affiant's belief that there is probable cause to believe that pertinent information relating to SEARCY's criminal activity, communications with friends/associates on his intended actions, and/or location information both before and after his criminal activity are being stored on **Subject Electronic Device**.

34.     I further request that the Court authorize execution of the warrants at any time of day or night, owing to the potential need to search the **Subject Electronic Device** outside of daytime hours, for example, based on the technology involved in the search.  Because the **Subject Electronic Device** is already in law enforcement custody, there will be no additional intrusion from searching the phone at night.

## CONCLUSION

35.     Based on the foregoing, Your Affiant submits that there is probable cause to support a warrant to search the Subject Electronic Device described in Attachment A and seize the item described therein associated with the distribution of and conspiracy to distribute controlled substances in violation of 21 U.S.C. Sections 841, 846, as well as violations of Title 18, U.S.C., Section 922(g), and using the Search Protocol described in Attachment B.

*Michael C. Collins*
_____
TFO Michael Collins
Drug Enforcement Administration

Sworn and subscribed before me this ___30th___ day of September, 2022.

_____
The Honorable Brendan A. Hurson
United States Magistrate Judge